

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00138-CV

**IN THE INTEREST OF N.A.C. JR.**, J.A.C., and M.I.C., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2016PA00803
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:          Sandee Bryan Marion, Chief Justice
                  Rebeca C. Martinez, Justice
                  Patricia O. Alvarez, Justice

Delivered and Filed:  July 19, 2017

AFFIRMED

This is an accelerated appeal from the trial court's order terminating appellant's parental rights to her three children, N.A.C., Jr., J.A.C., and M.I.C.[1]  In a single issue, appellant challenges the sufficiency of the evidence in support of the trial court's finding that termination of her parental rights was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2016).  We affirm.[2]

### BACKGROUND

On April 19, 2016, the Texas Department of Family and Protective Services (the "Department") filed a petition to terminate appellant's parental rights to her three children.  On

---

[1] N.A.C. was born on August 28, 2009; J.A.C. was born on April 7, 2013, and M.I.C. was born on March 6, 2014.

[2] The trial court also terminated the father's parental rights.  The father is not a party to this appeal.

February 24, 2017, the trial court held a one-day bench trial on the merits of the case. Although appellant appeared with counsel at the preliminary hearings, she did not appear at the termination trial. The State called the only witnesses who testified.

The Department's investigator assigned to the case, Jennette Salazar, testified the Department's first referral occurred on January 29, 2016, when law enforcement found N.A.C. on the streets. Because no one had reported N.A.C. as missing, the Department eventually identified N.A.C.'s parents based on their prior history with the Department on allegations of domestic violence between the parents and of drug use by appellant and her sister (the maternal aunt). After N.A.C. was found on the street and the parents were identified, Salazar initially made contact with the maternal aunt. Aware of the past drug allegations, Salazar asked the maternal aunt about marks the aunt had on her hand. The aunt said she had been in an accident. However, the aunt agreed to a drug test, which later came back positive for methamphetamines and heroin. When appellant arrived, looking nervous and upset, she told Salazar she had been looking for N.A.C., she had contacted the police, and when the police told her N.A.C. was at a shelter, she decided not to report him missing. At this time, appellant, her three children, and the maternal aunt lived together. Salazar said that after appellant's drug test came back positive for methamphetamines, the Department implemented a safety plan with the maternal grandmother, who agreed to temporarily supervise appellant.

Another referral, on February 9, 2016, alleged N.A.C. had taken a syringe containing a liquid to his school. N.A.C. told school personnel the syringe belonged to his maternal aunt. N.A.C. reenacted how his aunt would inject herself in her hand, leg, and under arm every day. He also said his father smoked something through a shirt. Another drug test on appellant came back positive for methamphetamines. Based on this referral, the Department required the maternal aunt to move out of the house, and required the maternal grandmother to supervise appellant at

appellant's house. When the maternal grandmother moved into appellant's house, Salazar visited the house and discovered some trash around the rooms, and there was no food because the refrigerator was not working. There were no beds for all the children; instead, the house had one queen size bed.

On February 17, 2016, after continued concerns about appellant's drug use while caring for her children and because the maternal grandmother may not have been aware of the drug use, the Department implemented a parental-child safety placement with Barbie C., the children's paternal aunt,[3] and allowed appellant to have supervised visits with her children. The Department also allowed appellant to engage in services through Family Based Safety Services.

On April 9, 2016, Barbie C. took N.A.C. to Clarity Child Guidance Center because he displayed suicidal ideations and was having outbursts at school. A child therapist who treated N.A.C. told Salazar the relationship between appellant and Barbie C. was negatively affecting N.A.C. On April 19, 2016, the Department filed its petition for termination of parental rights. Salazar explained that by this time, Barbie C. was not receiving child support from appellant, Barbie C. refused to continue as the parental-child safety placement because of disagreements with appellant, and appellant could not provide another appropriate caregiver.

In addition to drug use, Salazar said the Department also was concerned about the parent's "instability" because the father was homeless, appellant did not have a job, appellant sustained herself and her children with the children's Social Security income, and appellant was having difficulty finding a new place to live. Salazar said appellant indicated her concern about drug addicts around the house.

---

[3] Barbie C. is an administrative assistant for the Department.

Salazar stated she also had medical concerns about the children. She said J.A.C. suffered from severe hearing loss and speech delay because appellant failed to take him to a doctor for an ear problem,[4] and he had missed about four appointments with his ear doctor before the Department became involved. M.I.C. was not fully immunized.

Helen Bennett-Lopez, director for an outpatient substance abuse treatment program, testified appellant was admitted to the program in mid-July 2016 for twelve weeks of services. Appellant's treatment plan called for appellant to be reunified with her children, and included obtaining employment, securing independent living accommodations, refraining from illegal drug use, and complying with other Department requirements. Appellant was unsuccessfully discharged from the program on December 27, 2016, due to noncompliance with attendance requirements. Bennett-Lopez said appellant missed ten of her thirteen scheduled appointments. Bennett-Lopez did not believe appellant took her services seriously, and she thought there was more drug usage than appellant was willing to admit.

Elena Silverman, the Department caseworker, testified appellant completed a parenting class and a psychological evaluation, but no other services. During the pendency of the case, appellant tested positive for methamphetamine and amphetamine. Silverman said appellant initially tested negative for drugs and consistently stayed in contact with the Department and visited with her children. However, starting in either August or September, appellant began to miss her outpatient substance abuse appointments, and missed or came very late to her weekly visits with her children. When Silverman discussed the positive drug test results with appellant, appellant told her the results belonged to someone else. Because of her inconsistent visits, the children began to display "significant behavioral issues." Silverman explained N.A.C. would

---

[4] J.A.C.'s hearing problem was first identified when he was about six months old.

become upset, perform poorly in school the day after the missed visit, act aggressively toward his younger siblings, and once kicked a hole in Barbie C.'s wall. Both N.A.C. and J.A.C. are in therapy, and N.A.C. receives psychotropic medications.

Silverman believed termination of appellant's parental rights was in the children's best interest because of her continued instability, her positive drug test results, her failure to understand how missing visitation negatively impacts N.A.C., and her failure to address J.A.C.'s hearing problem. Silverman also said appellant has not provided her children with safe and stable housing, or demonstrated that she will maintain her sobriety to properly care for the children. According to Silverman, N.A.C. expressed a desire to live long-term with his paternal grandmother who helped Barbie C. daily with the children. Silverman stated the Department's plan is for Barbie C. to adopt the children, Barbie C. has demonstrated the ability to meet the children's needs, and the children have improved under her care.

While under appellant's care, N.A.C. was twice held back in kindergarten because of tardiness and missed school days and, at the age of seven, could only verbalize twenty-two sounds of the alphabet. However, Silverman said N.A.C. now has fewer outbursts and appears to be happy and doing well at Barbie C.'s house. J.A.C. wears hearing aids, receives additional help from an auditory teacher at school, speaks with less difficulty, and attends all medical appointments. However, because appellant did not follow through with J.A.C.'s medical care for years, he may never be developmentally on target due to his hearing loss. M.I.C. has gone from needing speech therapy four times a month to only twice a month, was developmentally delayed more than eight months but is now doing well in daycare, and has all of her immunizations.

Alicia Hyk, the CASA worker, testified termination of appellant's parental rights was in the children's best interest because appellant either missed or was late to visits with her children, which in turn resulted in anger, outbursts, and swearing by the children. When appellant did visit

her children, she had problems engaging with more than one child at a time. Hyk believed appellant had not addressed the issues that led to removal of the children, and appellant could not adequately care for the children. She also thought Barbie C. could meet the children's medical needs.

Finally, Barbie C. testified that when the children were first placed with her, in August 2016, the two youngest were very quiet, they wanted to stay up all night, they had no structure, and they did not know how to use eating utensils. She said N.A.C. would not sleep at night, was very nervous and afraid, and said everything was his fault. She said J.A.C. currently receives both general and special education at school, and she is working with a local hospital to obtain speech therapy in addition to the therapy he receives at school. Now, the children are more verbal, more structured, they can dress themselves and are potty-trained, and they play and are happy. Barbie C. believed she had bonded with the children and wanted to adopt them. She explained she could not keep the children during the initial parental-child safety placement because she was afraid of appellant and appellant was disruptive.

## BEST INTEREST

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory grounds for termination and that termination is in the child's best interest. TEX. FAM. CODE §§ 161.001(b)(1),(2); 161.206(a) (West 2014).[5] There is a strong presumption that keeping a child with a parent is in the child's best

---

[5] The trial court terminated appellant's parental rights after finding the Department proved by clear and convincing evidence the following four statutory grounds: she knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; she engaged in conduct that endangered her children; she constructively abandoned the children; she failed to comply with her court-ordered plan; and she used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program or, after completing the program, continued to abuse a controlled substance. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (N), (O), and (P). Appellant does not challenge these grounds on appeal.

interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Family Code section 263.307(b).

We also apply the non-exhaustive *Holley* factors to our analysis. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Finally, evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). A trier of fact may measure a parent's future conduct by her past conduct and determine whether termination of parental rights is in the child's best interest. *Id.*

When reviewing the sufficiency of the evidence, we apply the well-established standard of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency).

Only N.A.C. expressed his desire, which was to live with his paternal grandmother. With regard to the present and future emotional and physical danger to the children, appellant failed to complete the substance abuse treatment program and was unsuccessfully discharged, and she continued to test positive for drugs. The trial court had before it evidence that appellant did not address the children's medical needs while they were under her care. Appellant failed to provide her children with safe and stable housing, and could not provide proof of employment. The future

plan called for the paternal aunt, Barbie C., to adopt the children, and the trial court had before it evidence that Barbie C. provided for the children's physical and medical needs and the children all had improved under her care.

Considering all the evidence in the light most favorable to the best interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of appellant's parental rights was in the children's best interest.

## CONCLUSION

We overrule appellant's issue on appeal and affirm the trial court's Order of Termination.

Sandee Bryan Marion, Chief Justice